NOT DESIGNATED FOR PUBLICATION

No. 121,869

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of P.H.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; J. PATRICK WALTERS, judge. Opinion filed June 26, 2020.
Affirmed.

*Grant A. Brazill*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for
appellant.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before BRUNS, P.J., GREEN, J., and TIMOTHY J. CHAMBERS, District Judge, assigned.

PER CURIAM: Mother appeals the district court's termination of her parental rights
to her daughter, P.H., arguing that the district court erred by admitting improper character
evidence at the termination hearing and challenging the sufficiency of the evidence to
terminate her parental rights. After reviewing the record, we affirm the trial court's
decision for reasons as set out below.

Mother's involvement with Kansas Department for Children and Families (DCF)
began long before she gave birth to P.H. Mother's first child, R.A., was born in
November 2007. In January 2008, DCF began investigating allegations that Mother had
left R.A. with "a day care provider for an extended period of time." DCF received
additional reports that Mother physically abused R.A. and that Mother used illegal drugs.

1

In August 2008, the district court adjudicated R.A. to be a child in need of care (CINC), and in January 2010, Mother relinquished her parental rights to R.A.

Mother became pregnant again, and DCF received a report that she was using marijuana. When J.H. was born in September 2010, Mother tested positive for methamphetamine and J.H.'s meconium tested positive for alcohol. J.H. went home with Mother and they engaged in family preservation services, but in September and October 2011, DCF received reports that Mother was using illegal drugs while caring for J.H.

On March 22, 2012, Mother took J.H. to the hospital and reported that J.H. had fallen down some stairs the night before and had a seizure. Medical personnel discovered amphetamine and methamphetamine in J.H.'s system and did not believe Mother's report. J.H. had bruises on multiple areas of her body, head trauma, retinal hemorrhages, apparent chemical burns, and a fractured jaw. She was malnourished and was missing several teeth, which one doctor believed had been pulled. Doctors reported to law enforcement their belief that J.H. had suffered ongoing and severe physical abuse. A search of Mother's home revealed bloody blankets, bloody clothing, a bloody washcloth, a bloody pillowcase, drug paraphernalia, and a pair of pliers. A search of J.H.'s maternal grandmother's home revealed five teeth in a purse that belonged to Mother, metal tweezers, and two pairs of pliers. J.H. died from her injuries on March 30, 2012.

The State charged Mother with first-degree murder of J.H. and on May 31, 2013, pursuant to a plea agreement, Mother pled guilty to one count of involuntary manslaughter. On July 19, 2013, the district court sentenced her to 31 months in prison and 24 months of post-release supervision. After Mother served her sentence and was placed on post-release, but she relapsed, using illegal drugs and was reincarcerated.

On July 25, 2017, the Kansas Highway Patrol responded to a reported vehicle accident in Sedgwick County. A witness told Master Trooper Darren Moser that a truck

2

had crashed into a fence and the individuals in the truck had fled into a nearby shed or barn. S.H. (Father) came out of the shed and told Moser and Trooper Thomas Case that Mother, and some other individuals were still inside, and they had been camping in the building. Lieutenant Maggie Schreiber of the El Dorado police department was at the scene to process a stolen vehicle found there, and when Mother came out, she told Schreiber that she had been sleeping in the barn for two nights and that there was another vehicle there that she believed was stolen. In total, law enforcement found three stolen vehicles and additional stolen items at that location. Mother was never arrested, charged, or convicted as a result of the events of that day.

In December 2017, DCF received a report Mother was pregnant with P.H. and was using methamphetamines. DCF social worker Dalena Mar went to Mother's home and Mother willingly submitted to hair follicle drug testing, which was negative for methamphetamines but positive for marijuana. Mother admitted using marijuana before discovering that she was pregnant. With Mother's cooperation, Mar began family preservation services through Saint Francis Community Ministries (Saint Francis) in January 2018. Saint Francis assigned social worker and permanency specialist Lavana Faine as P.H.'s primary caseworker. It should be noted that at the subsequent termination trial, the parties stipulated to the admission of Saint Francis' reports—including visitation reports—as Father's Exhibits B through L. The district court admitted those reports into evidence, but they are not included in the record on appeal.

On January 2, 2018, a Derby police officer, Chris Clennan, pulled over a car Mother was driving after an individual reported someone in the car had stolen his backpack. When the officer executed the stop, a male got out of the passenger's side, dropped the stolen backpack, and ran from the scene. Although Mother at first denied knowing the man who had run from the car, she eventually said his name was Mikey and his girlfriend had called her to pick him up. The car smelled like marijuana and when the officer searched the car, he found two marijuana joints and several additional stolen

3

items. He arrested Mother, but she was not criminally charged for her involvement in the incident.

In February 2018, Mother gave birth to P.H. Mother and P.H. both tested negative for any drugs. P.H. had an infection, which hospital staff told DCF was caused by Mother waiting over 25 hours after her water broke to come to the hospital. At least one doctor at the hospital expressed concern about P.H. going home with Mother in light of Mother's history. The State filed a CINC petition about P.H. on February 21, 2018, and the district court issued an ex parte order placing P.H. in temporary DCF custody.

At a hearing the next day at which Mother was present and represented by appointed counsel, the district court ordered P.H. to remain in DCF custody. The district court also ordered Mother and Father to submit to drug testing; complete clinical evaluations and follow any recommendations; abstain from using alcohol and illegal drugs; sign all necessary releases of information and follow all recommendations of any evaluations, assessments, or treatment plans; maintain and document full-time employments; obtain and maintain appropriate housing; complete parenting classes and provide the court with written verification; and submit to a substance abuse evaluation and follow any recommendations. Mother submitted to a drug test the same day and tested "positive for 'oxy'"; Father tested positive for THC and benzodiazepine.

Later that month, Wichita police went to Mother's home looking for Father and Father's brother, both of whom had outstanding felony warrants for aggravated robbery. Officer Jamie Thompson noted "a strong odor of marijuana coming from the residence." Father and Mother were not at home, but an officer saw them driving nearby; police stopped the car and took Father into custody. Father, who was under 18 years old at the time, was charged in juvenile proceedings with aggravated robbery.

4

At Officer Jeffrey Walter's request, Mother returned home and let police in to search for Father's brother, who ran from the adjoining duplex and was captured by police. With Mother's consent, Officer Thompson searched Mother's home for firearms, which Father's brother—a felon—was prohibited from possessing. Although Thompson found no firearms, she did find a bag containing syringes, Father's brother's social security card, and a spoon with methamphetamine residue on it. Thompson saw nothing that directly connected Mother and Father to the bag or its contents. She also saw a safe in the living room that was not searched.

On March 26, 2018, Mother told Faine she was no longer in a relationship with Father. The next day, Mother completed a substance abuse evaluation, during which she reported a history of mental health issues, including suicide attempts in 2004 and 2012, suicidal ideation, and a history of physical and verbal abuse by prior romantic partners. Although the evaluator diagnosed Mother with "amphetamine-type substance/stimulant, severe use disorder (dependence) and cannabis, mild use disorder," no further treatment was recommended.

On March 28, 2018, a clinical assessment was performed on Mother by Connie Mayes, MA, LMSW. Mother was diagnosed with persistent depressive disorder with anxious distress. Although the district court admitted Mayes' written assessment of Mother and two of her later progress reports into evidence at the termination trial, they are not in the record on appeal. Thus, the only evidence of the assessment before this court is from Mayes' testimony at the termination trial. Mayes recommended that Mother have a medication assessment and attend individual psychotherapy sessions. Mother and Mayes began weekly therapy sessions.

Mother submitted a statement of no contest to the CINC petition. On April 13, 2018, the district court adjudicated P.H. to be a CINC and ordered her to remain in DCF custody. The court renewed its prior orders for Mother and Father. Father completed a

5

substance abuse evaluation on April 24, 2018, and no further treatment was recommended.

On May 25, 2018, Mother told Faine that she and Father were still not in a relationship. On June 27, 2018, Mother told Faine that she had gotten a job and that she and Father had reunited and planned on living together. Faine reminded Mother to provide proof of her employment.

On June 29, 2018, Wichita police officers Brek Train and Brandon Faulkner responded to a report that shots had been fired into Mother and Father's home from another home. The officers found cartridge casings of different calibers outside the home and Train was concerned that there had been an exchange of gunfire. Five people—in addition to Mother and Father—and four dogs lived in the two-bedroom house; Train saw mattresses and bugs on the floor and the only working refrigerator was a mini-fridge. Faulkner learned that the incident had begun as a dispute over fireworks and had progressed to a physical fight between Father and some other men, but the officers did not arrest Father.

On July 18, 2018, the State filed a motion for finding of unfitness and termination of parental rights. Under K.S.A. 2018 Supp. 38-2271(a)(4), a presumption of unfitness applied to Mother if the State could "establish[] by clear and convincing evidence that [Mother] has been convicted of causing the death of another child of [hers]." The State asserted that because Mother was convicted of involuntary manslaughter of J.H., the presumption applied and K.S.A. 2018 Supp. 38-2271(b) placed the burden on Mother to rebut the presumption. The State also alleged that the following conditions rendered Mother unable to care properly for P.H. and were unlikely to change in the foreseeable future: (1) the use of dangerous drugs of such duration or nature as to render Mother unable to care for P.H.'s ongoing physical, mental, or emotional needs, pursuant to K.S.A. 2018 Supp. 38-2269(b)(3); (2) conviction of a felony and imprisonment, pursuant

6

to K.S.A. 2018 Supp. 38-2269(b)(5); (3) the unexplained injury or death of J.H. while in Mother's care, pursuant to K.S.A. 2018 Supp. 38-2269(b)(6); (4) failure of reasonable efforts by appropriate agencies to rehabilitate the family, pursuant to K.S.A. 2018 Supp. 38-2269(b)(7); and (5) lack of effort on Mother's part to adjust her circumstances, conduct, or conditions to meet P.H.'s needs, pursuant to K.S.A. 2018 Supp. 38-2269(b)(8).

As for the failure of reasonable efforts at rehabilitation and Mother's effort to modify her circumstances, the State acknowledged that Mother had made progress on completing her case plan tasks and complying with court orders, but the State nevertheless expressed grave concerns about Mother's history with J.H. and the potential for P.H.'s being "at risk of similar harm." Accordingly, the State asked the district court to terminate Mother's parental rights to P.H.

At a July 25, 2018 psychotherapy session, Mother told Mayes that she had completed a medication assessment. Mother said that no medication was recommended at that time, but she had been advised to seek another evaluation after further court proceedings.

In August 2018, Wichita police officer Blake McElwain responded to a report that a man had pointed a gun at Father inside an apartment. McElwain did not speak with Father, who was not at the apartment when he arrived; someone told him that Father had "jumped off of a balcony."

Around September 2018, Mother and Father began having unsupervised visits with P.H. Faine had no safety concerns about the visits. In November 2018, Saint Francis assigned family support worker Amanda Hart to the case. In December 2018, Mother and Mayes changed the timing of Mother's psychotherapy sessions from weekly to every other week.

7

On February 23, 2019, Father was involved in a vehicle collision. Wichita police officer Jax Rutledge determined that Father had driven into oncoming traffic at high speed to pass another vehicle and had then hit that vehicle. Father gave Rutledge several versions of events that led to the accident, and Rutledge eventually cited Father for failure to have his driver's license with him, failure to provide proof of insurance, careless driving, and driving on a suspended license.

On February 7, 2019, licensed social worker Alanea Hanna, who supervised Saint Francis' services for P.H., reviewed and approved a court report that recommended reintegration. Hanna approved a similar report prepared on March 1, 2019, in which Saint Francis again recommended reintegration. Although the district court took judicial notice "of the entire official file of the court" at the later termination trial, these court reports are not in the record on appeal, so the contents are known only to the extent that individuals testified about them at trial.

During a visit with P.H. on February 17, 2019, Mother contacted Hart. Mother was concerned that P.H. was sick and she had called the on-call support worker and asked if she could take P.H. to a doctor. The on-call worker contacted P.H.'s foster parents, who asked that Mother wait, but Mother told Hart she did not feel waiting was the right thing to do, so Hart told Mother to take P.H. to the doctor immediately. Hart met Mother at an immediate care facility, where a doctor diagnosed P.H. with an ear infection and an infected diaper rash. Mother later told Hart that the foster parents had not sent the prescription cream—for the rash—to the visit so Mother bought over-the-counter products to soothe P.H. during visits.

In March 2019, Hanna and Faine visited Mother and Father at home; Hanna was concerned that there were four pit bulls there. According to Faine, Mother and Father had owned one pit bull and one chihuahua-dachshund mix throughout the case. Mother's pit bull had given birth to a litter of puppies and one puppy remained. At the time of the

8

visit, Mother and Father were watching two additional pit bulls that did not belong to them. P.H. was not present at the home visit, and Mother and Father said that the additional dogs were not there when P.H. visited.

During that visit, Faine also observed security cameras, an expensive stereo system, and other high-end items, which Mother and Father said they had bought either on layaway or through rent-to-own programs; they also had multiple televisions, which they said came from combining households when Father moved in. Mother provided receipts for the rent-to-own items and for the utilities and rent to show that those accounts were current. Faine was also concerned that there were five cars in the driveway, but Father explained that he bought cars at auction, tagged them for $25, fixed them, and sold them to bring in extra income. Only three of the cars Faine saw that day had tags, but when Faine asked for verification, Mother brought vehicle titles to Faine's office.

Hanna approved and signed an April 5, 2019 court report that specified that Saint Francis did not recommend termination of Mother and Father's parental rights to P.H. That report did, however, recommend that Saint Francis workers speak with Mother and Father about their prior criminal convictions.

On April 8, 2019, M.W., whose sister lived across the street from Father, reported to police that he had seen a car speed down the street followed by a pickup truck. M.W. recognized Father as one of the car's occupants. He reported that the truck stopped behind the car and the people in the truck yelled at those in the car, one of whom got out and waved a handgun around.

The same day, Mother filed an amended motion in limine for determination of whether the presumption of unfitness based on J.H.'s death applied and seeking an order prohibiting "any reference to Mother's prior criminal case as inadmissible as improper character evidence." On April 12, 2019, Mother filed a second motion in limine, seeking

9

exclusion of evidence of criminal conduct that did not lead to a relevant criminal conviction. In a court report prepared for the termination trial, Saint Francis recommended reintegration of the family.

The district court heard the arguments and denied Mother's motions in limine, and the termination trial began on April 16, 2019. The State submitted into evidence the journal entry of judgment from Mother's conviction for involuntary manslaughter. Over Mother's objection, the State also submitted into evidence documents from the case in which Mother relinquished her parental rights to R.A.

At the trial, the State presented testimony from law enforcement officers Schreiber, Moser, Case, Thompson, Walters, Clennan, Train, Faulkner, McElwain, and Rutledge about Mother and Father's encounters with law enforcement as described above. Train additionally testified about an unspecified day in 2018, when he heard multiple gunshots coming from "the immediate area" of Mother and Father's home while he was working an unrelated disturbance about a block away. Over Father's objection, Train testified that Father was known among law enforcement to carry firearms, that he knew Father had been "involved in robberies and chases with the police department," and that law enforcement should "be cautious" when dealing with Father. McElwain similarly testified that Father had a reputation among law enforcement as a "troublemaker" with whom they should use caution. Faulkner testified that Father was known as a "[t]roublemaker" and that when he drives past the home in his patrol car and Father is outside, Father usually yells profanity at him.

The civilian witness, M.W., in addition to testifying about his observations of Father on April 8, 2019 to law enforcement, testified that in late March 2019 he had asked Father to stop revving his car engine because it was scaring M.W.'s niece. According to M.W., Father told him to mind his own business and when M.W. walked

10

away, Father pulled a gun out of his waistband and an unidentified person at the scene with Father said, "'[W]e have got a piece.'"

The State also presented testimony of DCF and Saint Francis employees. Over Mother's objections, DCF social worker Allyson Angle testified about the investigation that led to Mother's relinquishment of her parental rights to R.A. back in January 2010. Angle also testified that about the allegations about Mother's behavior around J.H. and she stated that Mother had refused an October 2011 request for drug testing. Angle opined that Mother had a pattern of doing well for short periods of time but could not maintain abstinence from illegal drugs and unable to maintain a positive support system. While working with Mother, Angle had been concerned about: (1) "'the people [Mother] was with"; (2) Mother's drug use; (3) domestic violence involving Mother's boyfriends, although Angle acknowledged she and Mother never talked about domestic violence; and (4) "that there was something more going on than what she was telling us in the home." Angle opined that throughout the cases involving A.R. and J.H., she saw a detrimental pattern involving the men in Mother's life.

Angle then testified that reviewing DCF records about P.H. left her concerned "[b]ecause it's still continuing the same pattern. She's able to maintain for short periods of time, but yet there's ongoing law enforcement contact, there's ongoing illegal activities, not only in her home, but also just in regard to the people that she associates with." Angle believed that reintegration was not a viable option for P.H. because she did not think that Mother "would be able to maintain not having contact with law enforcement, not having contact with illegal substances, and not having positive associates in her life," which Angle felt would harm P.H.'s physical and emotional wellbeing. Angle testified that even when law enforcement contact did not lead to Mother being charged, "anybody that has consistent law enforcement contact that's of a negative variety shows concern that they are doing something to attract that attention within their lives." Angle recommended that Mother's parental rights to P.H. be terminated.

11

On cross-examination, Angle admitted that she had no firsthand knowledge of Mother and Father's relationship or of any domestic violence between them. She further admitted that she "didn't do anything" to investigate Mother's current sobriety, but she maintained that consistent negative drug test results would not alter her opinion. Angle conceded she had not requested any information from St. Francis before forming her opinion.

D.C.F. social worker Mar testified that she did not think reintegration was viable, even though she had not spoken directly to Saint Francis workers about reintegration. When asked why, Mar stated generally, "I think that the environment that Mother and Father continue to be involved in puts the child at risk of neglect and abuse." Mar also recommended that the district court terminate Mother and Father's parental rights: "With all the information that has been provided to me within the DCF history, the current law enforcement contacts, the information regarding the environment that the parents are involved with, I have great concerns for this child's wellbeing." Her concerns were based in part on the "type of law enforcement contact and the individuals that parents have been engaged with and concerns of weapons." She opined that despite their access to resources, Mother and Father maintained the same environment they had in the past and did not apply what they had learned through those resources. Upon questioning by the district court, Mar clarified that she had not been actively involved in P.H.'s case since July 2018.

Licensed social worker and DCF foster care administrator Kristen Peterman, who had been involved with determining the direction of P.H.'s case, testified that she had repeatedly talked with DCF and Saint Francis workers about P.H. in formal meetings, informal conversations, and email. Throughout the case, Peterman believed that reintegration was not the optimum result, based on Mar's concerns and on Peterman's similar belief that Mother and Father had failed to make "secondary changes." Although Peterman acknowledged that Mother and Father could "do things that are asked of them,

12

such as attend therapy, maintain housing, [and] maintain employment," she pointed out that they were "still associating with individuals who have criminal activity." Peterman asserted that the level of negative law enforcement contact surrounding Mother and Father "would put a child at risk," as would being around weapons that are not stored properly or are fired during neighborhood disputes.

Peterman opined that Mother and Father's parental rights to P.H. should be terminated. When asked why, Peterman referred to Mother and Father's criminal history and history of DCF involvement, stating that she doubted their ability to maintain a safe environment for P.H. without continual involvement from DCF, Saint Francis, and the court. Peterman rhetorically questioned what services Mother and Father were using; how they were applying what they learned; whether they took responsibility for their behavior; whether they tried to change their behaviors, their parenting skills, and their community contacts; whether they could provide a stable environment; and the identify of their "natural supports." She conceded that Mother and Father could meet P.H.'s physical, mental, and emotional needs "to an extent," but she noted that exposure to violence, "frequent negative law enforcement activity," and "the potential for drug use to be around" would impact any child's physical, social, and emotional wellbeing.

On cross-examination, Peterman conceded that her belief that Mother and Father failed to make secondary changes was not based on personal observations or personal knowledge. She was unaware of any concerns arising from the 12-hour, unsupervised, in-home visits P.H. had with Mother and Father up until the termination trial and she knew that Saint Francis continued to support reintegration. Moreover, Peterman could not recall hearing any evidence that guns had ever been in Mother and Father's home.

When Mother pointed out that she had tested negative for drugs since this case began and there had been no allegations of drugs in the home since this case began, Peterman clarified that her concern about drug use was based on Mother and Father's past

13

use and their interactions with individuals engaging in criminal behavior: "So the concern is that that could be a possibility. It has been in the past and could be a possibility in the future." Peterman stated that she had personally never told Mother or Father that the greatest concern was their lifestyle, nor had she asked St. Francis workers to do so.

Saint Francis social worker Hanna testified that she had staffed P.H.'s case "five or six times." Although she had reviewed and signed off on court reports recommending reintegration, including the final court report and the court report that recommended against terminating parental rights, Hanna testified that she personally believed that termination of Mother and Father's parental rights would best serve P.H.'s interests and needs. When asked why she felt Mother and Father could not meet P.H.'s mental, emotional, and physical needs, Hanna referred to her concerns about seeing four pit bulls during the home visit, seeing security cameras at the home, and seeing "three large-screen TVs" there that could not have been bought on Mother and Father's current income. She also expressed doubts about whether Mother and Father had legally obtained the "significant amount of clothing" they had for P.H., stating that she had no proof of illegality, "but I have instincts that would lead me to believe that there is some type of criminal activity involved." Hanna referred to general "concerns with Mother's past history" and she opined that Mother and Father "seem not as mature as parents we would look at," again asserting generally that "they haven't taken [the court-ordered] learning and transitioned that into their life."

Hanna conceded that she had not exercised her authority to reduce parental visitation and had allowed Mother and Father 12-hour continuing unsupervised visits with P.H. Hanna also agreed that when Saint Francis workers identified drug use or other problems, parents "addressed it perfectly." And until at least April 5, 2019, there was nothing in writing that identified Mother and Father's associations with criminals as a concern and gave them tasks to remedy that concern. To Hanna's knowledge, earlier case

plans had not involved a task of no police contact, because "the concerns came about recently, and so they weren't able to be articulated in the case plan or achievement plan." Hanna acknowledged that she had interacted with Mother and Father only "two or three times," and she had no firsthand knowledge of Mother and Father's status when the case began, but she maintained that they had made no secondary changes.

After Hanna's testimony, the State rested. The guardian ad litem declined to present evidence. Father and Mother moved to dismiss, alleging that the State had failed to meet its burden of proof. Mother argued that testimony that she completed her court-ordered tasks and everything in her case plan rebutted the presumption that she was unfit. The district court denied the motion.

Mother's first witness was Faine, who testified that she met with Mother monthly, "give or take one or two months," and Mother had a positive attitude, was always compliant, and never challenged tasks set for her. Mother also attended and participated in case plan meetings every six months, at which she asked questions and they reviewed orders from the district court and from Saint Francis.

According to Faine, Mother completed all of the court-ordered tasks: she had completed a clinical assessment and followed the resulting recommendation for continuing therapy; she had completed a drug and alcohol assessment, after which no further services were recommended; she signed all necessary releases of information; she submitted to random drug testing as requested; she obtained and maintained appropriate housing, living in the same residence throughout the case; she obtained and maintained full-time employment as soon as she was cleared to work post-childbirth, and she had recently been promoted; she completed a parenting class and implemented the skills learned there during visits with P.H.; and she refrained from using drugs, alcohol, or prescription drugs for which she did not have a valid prescription. The State stipulated to

15

admitting into evidence certificates of completion of parenting classes, but those certificates are not in the record on appeal.

St. Francis social worker and permanency specialist Faine testified that once Mother and Father completed the court orders, Saint Francis recommended a six-month reintegration plan with additional support and a safety plan because of Mother's history with J.H., not her current behavior. Faine testified that she was unaware of much of Mother and Father's police contact until the trial but learning of it did not change her recommendation for reintegration. If the district court did not terminate parental rights, Faine planned to begin the six-month reintegration plan immediately.

Faine had no safety concerns about leaving P.H. in Mother and Father's care. Faine had observed a very strong bond between Mother, Father, and P.H., and she believed Mother and Father would do anything to protect P.H. Faine also testified that around September 2018, law enforcement removed one of Father's minor nephews from Father's sister's home and placed him with Mother and Father. She testified that for that to happen, law enforcement would have done a walk-through of Mother and Father's home and found everything satisfactory.

Faine also saw Mother and Father make secondary changes, specifically noting that they communicated well with their support worker and they kept Faine informed of any concerns about P.H.'s health or safety. Faine believed that Mother and Father used the resources available to them, improved themselves, and made secondary changes so they could care for P.H. They participated in P.H.'s doctor's visits as much as possible, even taking P.H. to the doctor themselves at times.

On cross-examination, however, Faine's testimony changed, acknowledging that Mother had not complied with Mayes' recommendation that she have a medication evaluation and that Mother's substance abuse evaluation reflected inaccurate information.

16

Faine stated that Mother never provided a copy of her lease despite Faine's multiple requests. Mother and Father did not give Faine a satisfactory explanation about how they obtained an excessive amount of food Faine saw during one visit. And because Faine had no in-depth budget for Mother and Father, she did not know the source or amount of their income.

Contrary to her testimony on direct examination, Faine testified that after hearing the trial testimony about Mother and Father's "ongoing law enforcement contact," she was concerned about P.H.'s safety with them. By the end of the State's cross-examination, Faine changed her mind and stated that she no longer believed Mother and Father had made secondary changes. During cross-examination by the guardian ad litem, Faine stated that the evidence she heard at the termination hearing made her think that Mother and Father had not told her many things that they should have, and she no longer trusted either Mother or Father.

On redirect by Mother, however, Faine agreed that although the evaluation reports contained less than complete information, other documents disclosed the additional information and perhaps the evaluation reports did not reflect everything discussed during the evaluations. Faine reaffirmed that Mother's only positive drug test during this case was her first test and she agreed that maintaining sobriety was a secondary change. Directly contradicting her testimony on cross-examination, Faine testified on re-direct that she had never asked Mother for a copy of the lease. Hart also testified on Mother's behalf, stating that Mother obtaining medical care for P.H. in February 2019 was an example of Mother making secondary changes based on what she had learned in parenting class, and Hart believed Mother could meet P.H.'s needs.

Therapist Mayes testified about her interactions with Mother during her clinical mental health assessment in March 2018 and through ongoing individual psychotherapy sessions. She said that Mother was open during their sessions and talkative about the

17

proceedings with P.H., but she was initially "shut down" about J.H. Yet by July 2018, Mother had begun talking more about J.H., expressing emotion, and trying to figure out what decisions she should have made differently and her role in J.H.'s death. Mayes testified that she saw Mother begin to acknowledge her responsibility for events, become more thoughtful, and be clear that she wanted her situation with P.H. to be different.

Mayes and Mother discussed Mother's history of abusive relationships with men and what Mother's plans were to protect P.H. from that environment, and Mayes reported that Mother engaged willingly in those discussions. Mother recognized relationship red flags and expressed her desire to never again put her child in an abusive situation. After Father moved in with Mother, Mother and Mayes discussed him specifically, and Mother "has always been really clear" that her priority was P.H., not Father.

Mayes saw Mother for therapy most recently on April 10, 2019, the week before the termination trial. She opined that Mother "has worked very hard," noting that Mother maintained employment, paid her bills, and remained drug-free, despite the stress from the legal proceedings. Mayes said that Mother told her keeping P.H. safe is her top priority and Mayes had seen nothing to suggest otherwise. Mayes discussed Mother's coping skills, which included being with her dogs, leaning on her mother and her grandparents, writing and discussing her writing, and making collages. Mayes also testified that she had sometimes communicated with Faine, who "always indicated to [Mayes] that [Mother] was doing exactly what she was supposed to do to achieve reintegration and that Saint Francis was supportive of reintegration."

On cross-examination, Mayes agreed that throughout Mother's life her choice in associates were "part of her problem" and that she would be concerned if Mother was continuing to associate actively with people who commit crimes and have drugs and firearms. She agreed that during the initial assessment Mother did not mention Father's criminal convictions. Mayes agreed that Mother's success depended partly on her being in

18

a stable relationship with someone who is drug free, stable, and supportive. She also acknowledged that Mother did not return for another medication assessment as recommended, but Mayes saw no need for Mother to have a second medication evaluation.

After Mayes' testimony, Mother rested. Father called Faine to testify briefly, and then Father rested as well. The district court heard closing argument from the parties and ruled that the journal entry of judgment from Mother's conviction for involuntary manslaughter created a rebuttable presumption that Mother was unfit to parent P.H. See K.S.A. 2019 Supp. 38-2271(a)(4). The court held that Mother was unfit, and she had failed to rebut the presumption of unfitness under K.S.A. 2019 Supp. 38-2271. The court also found that although Mother and Father completed all of the court-ordered tasks, they failed to make secondary changes and apply what they learned, a failure the court saw through Mother and Father's "continued contact with law enforcement," Mother's use of marijuana "throughout the pregnancy" with P.H., and Mother and Father's being in "at-risk situations." Noting that there were no specific case plan tasks about contact with law enforcement or association with people using illegal drugs or committing crimes, the district court stated: "[T]hat's considered still in our society to be not normal, and I don't know how you make a plan for something like that."

The court considered child time as directed by K.S.A. 2019 Supp. 38-2201(b)(4) and then "ma[d]e a finding that failure of reasonable efforts made by the appropriate public or private agencies to rehabilitate the family, conviction of a felony and imprisonment, and a lack of effort on the part of the parents to adjust the circumstances, conduct, or conditions to meet the needs of the child." It found that clear and convincing evidence showed that termination of Mother and Father's parental rights was in P.H.'s best interest.

19

On July 26, 2019, the district court issued its written order finding Mother unfit and terminating her parental rights to P.H. As in its oral ruling, the district court held that the presumption of unfitness under K.S.A. 2019 Supp. 38-2271(a) applied to Mother and she failed to rebut that presumption. The district court adopted the facts alleged in the motion for termination as its findings of fact, and it incorporated by reference "specific findings of fact as set forth in the record." The district court also held that the State had proved by clear and convincing evidence that Mother was unfit to care properly for P.H. because of the following conduct or conditions unlikely to change in the foreseeable future: (1) conviction of a felony and imprisonment, pursuant to K.S.A. 2019 Supp. 38-2269(b)(5); (2) the failure of the appropriate agencies' reasonable efforts to rehabilitate the family, pursuant to K.S.A. 2019 Supp. 38-2269(b)(7); and (3) Mother's lack of effort to adjust her circumstances, conduct, or conditions to meet P.H.'s needs. The district court then found that it was in P.H.'s best interests to terminate Mother's parental rights.

Mother filed her notice of appeal on August 19, 2019. The district court appointed counsel to represent Mother on appeal.

ANALYSIS

In her first issue, Mother argues that the district court improperly admitted character evidence the State presented. Mother argues that by allowing testimony from Schreiber, Moser, Case, and Clennan, the district court violated K.S.A. 60-447(a), which prohibits admission of "evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove [a character] trait to be bad," and K.S.A. 2019 Supp. 60-455(a), which prohibits admission of "evidence that a person committed a crime or civil wrong on a specified occasion . . . to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion." The State first argues that Mother did not preserve this issue for appellate review.

20

K.S.A. 2019 Supp. 38-2249(a) mandates that "[i]n all proceedings under [the revised Kansas Code for Care of Children], the rules of evidence of the code of civil procedure shall apply," except in a limited circumstance not applicable here. K.S.A 60-404 states:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

Mother argues that the admission of improper evidence through the testimony from Schreiber, Moser, Case, and Clennan requires this court to reverse the district court's order terminating Mother's parental rights. She asserts that she preserved the issue for appellate review by two motions in limine and by contemporaneously objecting at trial. But Mother does not provide an accurate citation to the record for either of her motions in limine, and she provides no citation to any objection at trial. For her motions in limine, Mother cites Volume I, pages 100 and 111, but Volume I of the record on appeal contains only 17 pages. Pages 100 and 111 of Volume II are the first pages of Mother's motions in limine. If you look at Volume VI which is the first volume of the transcript of the severance trial, pages 100 and 111 of the trial transcripts do not contain any reference to the motion in limine or evidentiary objections.

As the State points out, Supreme Court Rule 6.02(a)(5) requires an appellant to begin each issue with "a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on." (2019 Kan. S. Ct. R. 34.) The Kansas Supreme Court has repeatedly warned that "[l]itigants who ignore this rule risk a ruling that the issue has been waived or abandoned." See *State v. Sanders*, 310 Kan. 279, 303, 445 P.3d 1144 (2019); *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014). Mother has provided inaccurate citations to her motions in limine, no citation to a ruling on either of those motions, and no citations to her alleged contemporaneous objections to the

21

evidence. Thus, this court could resolve Mother's first issue by finding she failed to adequately brief it, thereby abandoning it on appeal.

Even if this court looks past Mother's inadequate briefing, there are preservation problems. The district court heard extensive argument on the motions in limine. With respect to evidence of Mother's prior conviction, the district court looked to K.S.A. 2019 Supp. 38-2271(a)(4), which allows a presumption of unfitness if a parent has been convicted of causing the death of another child of that parent. The district court ruled that "the only evidence required is proof of the conviction, not the underlying elements or facts surrounding the conviction. That is the only evidence that will be allowed to be presented to the Court under that statute."

The parties then continued to argue whether prior bad acts were admissible to prove unfitness and to show if those bad acts could continue into the future. Ultimately, the district court ruled:

> "I'm not going to allow the testimony.
>> "[THE STATE]: Okay. As to?
>> "THE COURT: As to present unfitness and/or future unfitness.
>> "[THE STATE]: Of what—as to the conviction?
>> "THE COURT: All right. Evidence as to the conviction is allowed. That's what I
> previously ruled. Nothing further than that will be allowed, other than the conviction.
> And that's based on Kansas statute[s] 60-455 and 448."

Thus, it appeared that the district court resolved the motions in limine in Mother's favor. But when Schreiber testified, the district court overruled Mother's objection that the State was introducing inadmissible character evidence. Mother did not request a continuing objection, and she did not object again during Schreiber's testimony. During Case's testimony, Mother objected once, but only on grounds that the testimony was cumulative. And Mother did not object at all during Moser's or Clennan's testimony. It

22

should be noted, the Father joined in Mother's motions in limine, but the trial withheld ruling on the motions as to Father.

Because she did not make a contemporaneous objection that Case, Moser, or Clennan's testimony was inadmissible character evidence, Mother did not preserve for appellate review her current argument that the district court erred in allowing it because it was inadmissible character evidence. See *In re F.C.*, No. 120,471, 2019 WL 3756319, at *3 (Kan. App. 2019) (unpublished opinion) (holding K.S.A. 60-404 barred an appellate challenge to social worker's qualifications as an expert witness in a termination of parental rights proceeding because the objection was not made at trial); *In re A.L.*, No. 110,374, 2014 WL 1612625, at *5 (Kan. App. 2014) (unpublished opinion) ("By failing to . . . object to the State's proffered evidence, Mother has waived any challenge to the evidence presented below."). The only testimony even possibly preserved for appellate review is Schreiber's. But even if the district court erred in admitting Schreiber's testimony, any error was harmless.

> "'Generally, when considering a challenge to a district judge's admission of evidence, an appellate court must first consider relevance. Unless prohibited by statute, constitutional provision, or court decision, all relevant evidence is admissible. Evidence is relevant if it has any tendency in reason to prove any material fact. To establish relevance, there must be some material or logical connection between the asserted facts and the inference or result they are intended to establish. [Citations omitted.]'"
> *Castleberry v. Debrot*, 308 Kan. 791, 812, 424 P.3d 495 (2018).

But even if evidence is irrelevant or prohibited by statute, "[e]rror in the admission or exclusion of evidence does not warrant reversal unless 'there is a "reasonable probability that the error will or did affect the outcome of the trial in light of the entire record."' [Citation omitted.]" 308 Kan. at 812. Even assuming solely for the sake of argument that the district court erred in admitting Schreiber's testimony, there is no reasonable probability that it affected the outcome of the trial.

23

Schreiber testified that on July 25, 2017, she went to "the area of Hillside and Highway 254" to process a stolen vehicle, but she could not immediately do so because Mother and other individuals were in a building at the scene. Mother came out of the barn after about two hours of police requests that she do so. Schreiber knew Mother "[t]hrough interactions with her previously when she lived in El Dorado." Mother told Schreiber that she had been sleeping in the barn for two nights and that she had not known the vehicles were stolen; Mother also told Schreiber, however, that "there was a Ford Focus that was also inside the barn that was probably stolen as well."

In comparison, Moser testified that he went to "the area of 254 and Hillside" on the morning of July 25, 2017. A witness told him that there were people in "the shed" at that location and Father came out of the shed and said Mother and another individual were still inside. After about three hours of periodic announcements asking Mother to come out of the shed, a detective made a telephone call and Mother came out. Moser testified that three stolen vehicles were located at the scene and, inside the shed, law enforcement discovered identification cards that had been reported stolen.

Thus, the only information Schreiber testified to that was not also included in Moser's testimony—to which Mother did not object—was that Mother said she had been sleeping in the barn for two nights, that she did not know the vehicles were stolen, and that there was another vehicle in the barn that was probably also stolen. Moser's testimony relates generally the same information as Schreiber's and Mother does not assert any material distinction between the two. Thus, even if the district court had excluded Schreiber's testimony, Moser's testimony—to which Mother did not object at trial—would serve the same purpose and impart the same information. There is no reasonable probability that excluding Schreiber's testimony would have affected the outcome of the trial. Thus, any error in its admission is harmless and does not warrant reversal of the termination.

WAS SUFFICIENT EVIDENCE PRESENTED TO SUPPORT TERMINATION OF MOTHER'S
PARENTAL RIGHTS?

Mother argues that the court erred by holding that she had not rebutted the presumption of her unfitness and that insufficient evidence supported each of the district court's additional bases for finding that Mother was unfit. The State disagrees, arguing that clear and convincing evidence supported all the district court's reasons for finding that Mother was unfit.

When this court reviews a district court's finding of unfitness, it considers all of the evidence in the light most favorable to the State to determine whether a rational factfinder could have found it highly probable that the parent was unfit. See *In re K.L.B.*, 56 Kan. App. 2d 429, 445, 431 P.3d 883 (2018). The appellate court's analysis does not involve reweighing conflicting evidence, evaluating the credibility of witnesses, or redetermining questions of fact. 56 Kan. App. 2d at 445.

A district court may terminate parental rights to a child adjudicated to be a CINC if the State presents clear and convincing evidence that the parent is unfit by reason of conduct or condition which (1) renders him or her unable to care properly for the child and (2) is unlikely to change in the foreseeable future. K.S.A. 2019 Supp. 38-2269(a). Under K.S.A. 2019 Supp. 38-2271(a)(4), a district court presumes that a parent is unfit if the State establishes by clear and convincing evidence that "the parent has been convicted of causing the death of another child . . . of the parent." If this presumption applies, the parent bears the burden to rebut it by establishing by a preponderance of the evidence "that the parent is presently fit and able to care for the child or that the parent will be fit and able to care for the child in the foreseeable future." K.S.A. 2019 Supp. 38-2271(b).

The district court here held that the presumption of unfitness under K.S.A. 2019 Supp. 38-2271(a) applied to Mother and that she had failed to rebut that presumption.

25

Applying the standard by which this court reviews a district court's finding that a parent was unfit, the parties argue over whether Mother proved by a preponderance of the evidence that she was presently fit and able to care for P.H.

But neither party acknowledges that "the trial court's determination that [Mother] had not overcome the presumption of unfitness was a negative finding." See *In re A.G.*, No. 92,452, 2005 WL 331812, at *4 (Kan. App. 2005) (unpublished opinion). A negative finding of fact occurs when the district court holds that a party has "failed to sustain its burden of proof." See *In re Marriage of Kuzanek*, 279 Kan. 156, 159, 105 P.3d 1253 (2005). Rather than looking to whether the evidence underlying the negative finding of fact was sufficient, as the parties here urge the court to do, an appellate court reverses a negative finding of fact only if "the party challenging the finding proves arbitrary disregard of undisputed evidence, or some extrinsic consideration such as bias, passion, or prejudice." See 297 Kan. at 160; see also *In re Adoption of D.D.H.*, 39 Kan. App. 2d 831, 836, 184 P.3d 967 (2008). This is true even when the negative finding occurs in cases that involve child custody and parental rights. See 39 Kan. App. 2d at 836; *In re Adoption of Baby Girl T.*, 28 Kan. App. 2d 712, 719-20, 21 P.3d 581 (2001).

Mother does not argue that the district court arbitrarily disregarded undisputed evidence, nor does she assert that the district court's finding that she failed to rebut the presumption of unfitness was based on an extrinsic consideration. Rather, she recites the evidence that weighs in her favor and asks this court to conclude that it "establishes that Mother was more likely a presently fit parent than not, and the presumption of unfitness was successfully rebutted." But this court does not reweigh evidence. Because Mother has failed to even assert that the district court's negative fact finding was based on an arbitrary disregard of undisputed fact or an extrinsic consideration, she has waived and abandoned that argument. See *Lambert v. Peterson*, 309 Kan. 594, 598, 439 P.3d 317 (2019) ("Because of [the appellant's] failure to brief or assert any of these arguments

before us, she has waived or abandoned them."). Thus, her challenge to the district court's finding that she failed to rebut the presumption of unfitness fails.

In addition to arguing that she sufficiently rebutted the statutory presumption of her unfitness, Mother also challenges the additional, alternate bases on which the district court found her unfit. But when this court reviews a finding of parental unfitness for which the district court relied on multiple statutory factors, it will affirm as long as it is established clear and convincing evidence supports a finding of unfitness based on one of the factors. See *Interests of G.A-S.*, No. 118,579, 2018 WL 2170077, at *3 (Kan. App. 2018) (unpublished opinion). So, this panel need not analyze Mother's arguments about the alternate bases for finding unfitness, as the district court's finding that Mother was presumed unfit and failed to rebut that presumption satisfies the required finding of unfitness.

Even if this panel was inclined to reach the merits of Mother's additional challenges, it faces another obstacle: an insufficient record. When this court reviews a district court's finding of unfitness, it considers all of the evidence in the light most favorable to the State to determine whether a rational factfinder could have found it highly probable that the parent was unfit. See *In re K.L.B.*, 56 Kan. App. 2d at 445. The party claiming error "has the obligation to ensure a sufficient record for us to consider those arguments . . . . If, as here, an argument depends on facts, those facts must be in the record." *In re A.A.-F.*, 310 Kan. 125, 141, 444 P.3d 938 (2019).

Here, the district court found that there was clear and convincing evidence that Mother was unfit because of the following conduct or circumstances that were unlikely to change into the foreseeable future: (1) the failure of appropriate agencies' reasonable efforts to rehabilitate the family; (2) conviction of a felony and imprisonment; and (3) Mother's lack of effort to adjust her circumstances, conduct, or conditions to meet P.H.'s needs. But as noted in the facts section above, the district court considered documents

27

that are not in the record on appeal, including visitation reports, Mayes' clinical evaluation and progress notes, and the reports Saint Francis created and submitted to the district court. Mother's failure to provide this court with all of the evidence admitted at trial and considered by the district court leaves this court unable to provide truly meaningful "review of all the evidence," as required to review the sufficiency of evidence supporting a decision to terminate parental rights. See *In re K.L.B.*, 56 Kan. App. 2d at 445.

This court has noted, even in the arena of child custody cases, that "[w]e cannot evaluate the sufficiency of the evidence supporting that finding without considering the [evidence] on which it was based." *In re N.U.*, 52 Kan. App. 2d 561, 567, 369 P.3d 984 (2016). In that case, the appellant argued "that the evidence at the hearing was insufficient to support the trial court's exercise of temporary emergency jurisdiction under the [Uniform Child Custody Jurisdiction and Enforcement Act]." 52 Kan. App. 2d at 566. But the appellant "did not include a transcript of that hearing in the record on appeal," so this court had no way to evaluate the sufficiency of the evidence presented at the hearing. 52 Kan. App. 2d at 566. Similarly, this court should find that it is unable to adequately review Mother's sufficiency arguments given her failure to include—in the record on appeal many of the evidentiary trial exhibits.

Even if the appellate record were complete, considering all the evidence in the light most favorable to the State, a rational factfinder could have found it highly probable that the Mother was unfit. It is not this court's function to reweigh conflicting evidence, evaluate the credibility of witnesses, or redetermine questions of fact. *In re K.L.B.* As previously indicated, the presumption of unfitness due to the death of the Mother's prior child was not overcome. That presumption alone is sufficient to establish the trial court's finding of unfitness. The evidence within the record before the court is sufficient to support the additional findings of the trial court as to unfitness. The Mother should be

28

commended for her efforts in turning her life around. The mother's tragic past along with her failure to alter her secondary lifestyle, support the trial court's findings of unfitness.

Affirmed.